USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 12, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                     :

MCKENNA LONG & ALDRIDGE, LLP, et  :
al.,                                    :
                                     :

              Plaintiffs,       :
                                     :

                -v-              :          14-cv-6633 (KBF)
                                     :

IRONSHORE SPECIALTY INSURANCE   :
COMPANY,                          :
                                     :

              Defendant.      :
------------------------------------------------------------X
                                     :

VINCENT W. SEDMAK,           :
                                     :

              Plaintiff,        :
                                     :

                -v-              :          14-cv-6675 (KBF)
                                     :

IRONSHORE SPECIALTY INSURANCE   :      OPINION & ORDER
COMPANY,                          :
                                     :

              Defendant.      :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Plaintiffs McKenna Long & Aldridge, LLP and Vincent W. Sedmak filed

motions for summary judgment seeking to enjoin a pending arbitration brought

against them by Ironshore Specialty Insurance Company before the International

Centre for Dispute Resolution.  For the reasons that follow, plaintiffs' motions are

DENIED, and summary judgment is GRANTED in favor of defendant.

I.     BACKGROUND

A.     Factual Background[1]

Plaintiffs in these declaratory-judgment actions are the law firm McKenna Long & Aldridge, LLP, and its partners Song Jung and Gaspara Bono (collectively, "McKenna"), and Vincent W. Sedmak, the chairman and chief executive officer of Eidos, LLC ("Eidos"). (Declaration of Kevin K. Windels, 14-cv-6633 ECF No. 28 & 14-cv-6675 ECF No. 23 ("Windels Decl.") ex. 1 ("SOC") ex. I.) Defendant is Ironshore Specialty Insurance Company ("Ironshore").

In 2010, Eidos took out a loan of approximately $20 million (the "Loan") from Stairway Capital Management II LP ("Stairway") in order to fund a patent enforcement litigation program in which McKenna served as Eidos' counsel. (See SOC ¶¶ 1, 11.) As a condition for the loan, Stairway required Eidos to obtain a contingent loss reimbursement policy. (SOC ex. K at 31 (§ 15.2(b)).) Sedmak requested such a policy from Ironshore on behalf of Eidos,[2] and in the process he

---

[1] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials. (14-cv-6633 ECF Nos. 21 ("MPSOF"), 29 ("MDSOF"); 14-cv-6675 ECF Nos. 18 ("SPSOF"), 22 ("SDSOF").) The Court generally cites to the parties' factual submissions only when they support a factual proposition advanced by a party in a Local Rule 56.1 statement or the briefing on this motion, cite or consist of relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible. See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). The factual allegations in plaintiffs' Local Rule 56.1 Statements are not supported by citations to evidentiary submissions, as required by Local Rule 56.1(d); the Court will nevertheless cite them where they are undisputed or the parties' briefing and/or supporting materials indicates that they are supported by relevant material that would be admissible. The Court recites only those facts relevant to the claims and defenses at issue.

[2] In his reply brief, Sedmak argues that there was no insurance "application" by Eidos, let alone one signed by Sedmak. (14-cv-6675 ECF No. 26 ("Sedmak Reply Br.") at 3.) This argument is unsupported by citation to evidence, nor does it find support in the parties' factual submissions.

and Stayko D. Staykov, Eidos' President and Chief Operating Officer, warranted and represented that Eidos' due diligence documents were valid, complete, and current through documents signed "Eidos, LLC" and "Eidos Partners, LLC," "by" Sedmak and Staykov.  (SDSOF ¶ 4; SOC ¶ 50 & ex. I.)  McKenna authored and signed several documents in connection with Eidos' application for the Policy, and these documents indicated that McKenna would serve as counsel in the patent enforcement litigation.  (Windels Decl. ¶ 15; 14-cv-6633 ECF No. 27 ("Opp. Br.") at 4.)

Ironshore subsequently issued the requested policy[3] (the "Policy"), which designated Eidos and its subsidiaries and affiliated companies the named insured, and Stairway the loss payee.  (SOC ex. A; see also SPSOF ¶¶ 4-5.)  Neither McKenna nor Sedmak signed the Policy.  (MDSOF ¶ 4; SDSOF ¶ 4.)  The Policy provided coverage to Eidos in the event Eidos failed to obtain recoveries from the patent enforcement litigation program required sufficient to repay the principal amount of the Loan by November 2, 2013.  (SOC ¶ 1, ex. A.)  The Policy contained an arbitration clause (MDSOF ¶ 3), which reads:

> In the event any controversy, claim or dispute arises in connection with this Policy, the Insurer and the Insured shall participate in a non-binding mediation in which the Insurer and the Insured shall attempt in good faith to resolve such controversy, claim or dispute. In the event any such controversy, claim or dispute is not resolved in mediation the matter shall be submitted to final and binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association

---

[3] The policy is Contingent Loss Reimbursement Insurance Policy No. 799500.  (MDSOF ¶ 3; SDSOF ¶ 3.)

then in effect.  Each party shall appoint one arbitrator
and the two arbitrators so appointed shall select a third
independent arbitrator.  Arbitration shall take place in
New York, New York, unless otherwise agreed.

(SOC ex. A § V.D.)

McKenna was paid $11,084,893 in legal fees in connection with the patent

enforcement litigation program.  (Windels Decl. ex. 11.)  Sedmak, as Eidos, used a

portion of the proceeds from the Loan to pay Sedmak a salary of $3,763,656.[4]

(SDSOF ¶ 5; Windels Decl. ¶ 23, ex. 9).  Ironshore contends that Sedmak was

without authority to do so, and that this constituted a misuse of loan funds.  (See

Opp. Br. at 14.)  In addition, $2 million in proceeds from the Loan was transferred

to Warren & Lewis Investment Corporation, a corporation in which Sedmak is the

owner and general partner.  (Windels Decl. ¶ 23, ex. 3; SOC ex. D at 14.[5])

Because principal from the Loan was outstanding on November 2, 2013,

Stairway and Eidos demanded that Ironshore pay pursuant to the Policy, and

Ironshore refused.  (14-cv-6633 ECF No. 20 ("McKenna Opening Br.") at 3; 14-cv-

6675 ECF No. 17 ("Sedmak Opening Br.") at 3.)

B.   Procedural Background

On October 8, 2013, Ironshore initiated the now-pending arbitration against

Eidos before the International Centre for Dispute Resolution ("ICDR").[fn]  (MDSOF

---

[4] Although Sedmak claims that Ironshore's allegation that Sedmak allocated nearly $4 million of the
Loan to himself as a salary is a "wild speculation," (Sedmak Reply Br. at 5), Sedmak does not cite to
any evidence as support for that statement or explain what the source of the funds used to pay his
salary was, if it was not proceeds from the Loan, nor does Sedmak deny that he used some of the
Loan proceeds to pay himself as a general matter.

[5] This factual allegation is set forth in Ironshore's opposition brief.  (See 14-cv-6675 ECF No. 21 at 5.)
Sedmak has not affirmatively denied it.

¶ 1; SDSOF ¶ 1.)  In the arbitration, Ironshore seeks, <u>inter alia</u>, a judgment that Ironshore owes nothing under the Policy, or alternatively a finding that its liability limit should be reduced by $5 million, actual damages in excess of $8.7 million, and punitive damages.  (SOC ¶¶ 119, 124, 131, 153, 159, 166, 174, 179, 184, 189, 203, 210, 216).

On November 26, 2013, Ironshore filed suit in this Court to compel Eidos to arbitrate.  (13-cv-8434 No. 1.)  Ironshore moved to compel arbitration on December 2, 2013, and this Court granted the motion on January 17, 2014.[6]  (13-cv-8434 ECF Nos. 22, 39.)  Eidos appealed, and the Second Circuit affirmed on December 23, 2014.  (13-cv-8434 ECF Nos. 47, 68, 78.)

Earlier, on January 2, 2014, Stairway sued Ironshore in this Court, also seeking to enjoin the arbitration in favor of litigation.  (No. 14-cv-00025 ECF No. 1.)  Owing to a lack of diversity, Stairway voluntarily dismissed its federal case, (14-cv-00025 No. 15), and re-filed in New York state court, where Justice Ramos refused to enjoin the arbitration as to Stairway, <u>Stairway Capital Mgmt. II L.P. v. Ironshore Specialty Ins. Co.</u>, No. 650363/2014 (N.Y. Sup. Ct. 2014) (Nos. 1, 112).

In June 2014, Ironshore added plaintiffs as respondents in the ICDR arbitration.  (MPSOF ¶ 1; SPSOF ¶ 1.)  Since then, the parties and the ICDR have engaged in extensive back-and-forth regarding whether their dispute is arbitrable, whether the issue of arbitrability should be decided by the ICDR, and whether they could in any event agree to arbitrate all of their disputes.  (<u>See</u> MPSOF ¶ 2; SPSOF

---

[6] The Court subsequently denied Eidos's motion for reconsideration on April 25, 2014.  (13-cv-8434 ECF No. 67.)

¶ 2; Windels Decl. ¶ 32, ex. 7.)  The ICDR has refused to declare that plaintiffs need not participate in the arbitration (MPSOF ¶ 2; SPSOF ¶ 2), and the parties have been unable to come to an agreement.

McKenna filed a complaint for declaratory judgment on August 19, 2014, and Sedmak did so on August 20, 2014.  (No. 14-cv-6633 ECF No. 1; 14-cv-6675 ECF No. 1.)  Ironshore filed answered on September 30, 2014.  (14-cv-6633 ECF No. 11; 14-cv-6675 ECF No. 11.)  On October 2, 2014, the Court ordered the McKenna and Sedmak actions to be coordinated for pre-trial purposes.  (14-cv-6633 ECF No. 12; 14-cv-6675 ECF No. 12.)  The Court held an initial pre-trial conference for both actions on November 14, 2014.

McKenna and Sedmak moved for summary judgment on November 25, 2014.  (14-cv-6633 ECF No. 19; 14-cv-6675 ECF No. 16.)  McKenna's and Sedmak's motions for summary judgment both seek (1) a declaration that Ironshore's claims against them under the Policy are not arbitrable and that they cannot be compelled to arbitrate; and (2) a declaration that any award Ironshore might obtain from the ICDR is unenforceable against them.[7]  (McKenna Opening Br. at 15; Sedmak Opening Br. at 15.)

On December 10, 2014, McKenna and Sedmak filed a joint letter informing the Court that the ICDR intended to appoint an arbitrator on their behalf and to proceed with arbitration on December 16, 2014, and requesting that the Court enter a temporary restraining order ("TRO") that would effectively suspend the

---

[7] McKenna's motion also seeks attorney fees and costs, and reserves the right to seek appropriate injunctive relief staying the ICDR arbitration.  (McKenna Opening Br. at 15-16.)

arbitration.  (14-cv-6633 ECF No. 23.)  The Court held a hearing on the TRO request on December 15, 2014, at which the parties agreed to stand down from the pending ICDR arbitration until December 31, 2014, by which time the Court stated it would have resolved the summary judgment motions.  (14-cv-6633 ECF No. 30; 14-cv-6675 ECF No. 24.)  The motions for summary judgment became fully briefed on December 23, 2014.  (14-cv-6633 ECF No. 35; Sedmak Reply Br.)

On December 31, 2014, the Court issued an order denying both McKenna's and Sedmak's motions for summary judgment in their entirety, and stating that the Court would provide a rationale for its decision in a separate Opinion & Order.  (14-cv-6633 ECF No. 36; 14-cv-6675 ECF No. 27.)  The order also stated in light of the fact that Ironshore did not cross-move for summary judgment, the Court was providing notice of its intent to dismiss these actions in their entirety at the time it issued the Opinion & Order, and that any party in disagreement with that proposed course of action should show cause why in a written submission due not later than January 7, 2015.  (14-cv-6633 ECF No. 36; 14-cv-6675 ECF No. 27.)  Neither party made a further filing.

## II.   SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure apply in declaratory judgment actions. Fed. R. Civ. P. 57.  Under Rule 56, summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—that is, "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  If the evidence favoring the non-moving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 586.

Under Rule 56(f)(1), the Court may, "[a]fter giving notice and a reasonable time to respond . . . grant summary judgment for a nonmovant."  Fed. R. Civ. P. 56(f).

III.   DISCUSSION

    A.   <u>Jurisdiction</u>

        1.   <u>Issuance of declaratory relief.</u>

            a)   Legal standard.

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not future relief is or could be sought."  28 U.S.C. § 2201(a).  "Potential future conduct can sustain a justiciable case or controversy if 'the facts alleged, under all

the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality.'" E.I. Dupont de Nemours & Co. v. Invista B.V., 473 F.3d 44, 47 (2d Cir. 2006) (quoting Md. Casualty Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).  "[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992).

> b)      Discussion.

The Court may appropriately entertain both McKenna's and Sedmak's declaratory judgment actions, as both McKenna's and Sedmak's actions are cases of actual controversy within the Court's jurisdiction.  First, McKenna and Sedmak are parties to substantial controversies involving Ironshore, as Ironshore is seeking millions of dollars in damages and other relief in the arbitration to which it has added McKenna and Sedmak as respondents.  Second, the legal interests of McKenna and Sedmak are clearly adverse to those of Ironshore, both with regard to Ironshore's legal claims, and with regard to their preferred forum for resolving those claims.  Third, the controversies are immediate and real, as Ironshore and the ICDR plan to move ahead with the arbitration to which McKenna and Sedmak object.  A declaratory judgment in both actions would thus serve the useful purpose of clarifying for the parties whether their dispute should properly be arbitrated before the ICDR, which will enable plaintiffs to make a fully informed decision as to

whether to participate in the arbitration.  Accordingly, the Court may issue a declaratory judgment in both of these actions.

      2.    <u>Judicial determination of arbitrability.</u>

      a)    Legal standard.

"The question whether the parties have submitted a particular dispute to arbitration, <u>i.e.</u>, the '<u>question of arbitrability</u>,' is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." <u>Schneider v. Kingdom of Thailand</u>, 688 F.3d 68, 71 (2d Cir. 2012) (alterations and emphasis in original) (quoting <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83 (2002)). Courts have generally found that agreements that do not mention or reference a particular non-signatory do not clearly or unmistakably evidence an agreement by that non-signatory to have an arbitrator determine whether the agreement is arbitrable. <u>See, e.g.</u>, <u>Sarhank Grp. v. Oracle Corp.</u>, 404 F.3d 657, 661-62 (2d Cir. 2005); <u>Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.</u>, 902 F. Supp. 2d 87, 97 (D.D.C. 2012); <u>Masefield AG v. Colonial Oil Indus., Inc.</u>, No. 05 Civ. 2231(PKL), 2005 WL 911770, at *2 (S.D.N.Y. Apr. 18, 2005). It is possible that clear and unmistakable evidence of an agreement to arbitrate arbitrability "might include . . . a course of conduct demonstrating assent . . . [or] an express agreement to do so." <u>Rent-A-Center, West, Inc. v. Jackson</u>, 561 U.S. 63, 79-80 (2010) (Stevens, J., dissenting) (citation omitted).

      b)    Discussion.

There is no clear and unmistakable evidence of an agreement to arbitrate arbitrability here.  The arbitration agreement is contained in the Policy, which is

11

not signed by McKenna or Sedmak, and which does not name McKenna or Sedmak as the named insured or loss payee.  The arbitration agreement also only authorizes an arbitration between "the Insurer," which is Ironshore, and the "Insured," which is Eidos, and it provides for a two-party procedure for selecting an arbitrator.  (See SOC ex. A § V.D.)  Accordingly, there is no evidence of a clear and unmistakable agreement to arbitrate by either McKenna or Sedmak.  The question of arbitrability in these matters is therefore a matter for judicial determination.  Schneider, 688 F.3d at 71.

        B.     Arbitrability

        Although federal policy generally favors arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  LJL 33rd Street Assocs., LLC v. Pitcairn Props. Inc., 725 F.3d 184, 192 (2d Cir. 2013) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)).  "[A]ny silence or ambiguity about whether [an issue] is arbitrable reverses the usual presumption that issues should be resolved in favor of arbitration.  U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 147 (2d Cir. 2001) (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995); Abram Landau Real Estate v. Bevona, 123 F.3d 69, 72-73 (2d Cir. 1997)).

        As previously explained, there is no express arbitration agreement between McKenna and Ironshore, or between Sedmak and Ironshore.  Accordingly, the Court's analysis of whether the parties are bound to arbitrate is guided by a presumption against arbitrability.  Nevertheless, there is no triable issue as to

whether McKenna or Sedmak have received direct benefits from the Policy, nor is there a triable issue as to whether McKenna is an intended third-party beneficiary of the Policy.  The Court accordingly must deny plaintiffs' motions, and grant declaratory judgment in favor of Ironshore.

In the absence of an express arbitration agreement, the Second Circuit "has recognized only 'limited theories upon which [it] is willing to enforce an arbitration agreement against a non-signatory.'"  Merrill Lynch Inv. Managers v. Opibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (alteration in original) (quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 780 (2d Cir. 1995)).  "There are five such theories: '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'"  Id. (quoting Thomson-CSF, 64 F.3d at 776).  The Court's analysis under each of these theories is governed by ordinary principles of contract and agency law.  Thomson-CSF, 64 F.3d at 776.  The Court will address each theory in turn, with the exception of assumption, which Ironshore does not advance as an argument for binding either McKenna or Sedmak to the arbitration agreement.  The Court will then address whether there is a triable issue as to whether McKenna or Sedmak is an intended third-party beneficiary of the Policy.

       1.     Incorporation by reference.

            a)     Legal standard.

A nonsignatory may be bound by an arbitration agreement when it has entered into a separate contractual relationship with a signatory that incorporates the existing arbitration clause.  See id. at 777; Clarendon Nat'l Ins. Co. v. Lan, 152 F. Supp. 2d 506, 520 (S.D.N.Y. 2001).

13

b)    Discussion.

Ironshore argues that McKenna is bound to arbitrate because McKenna signed certain documents that Eidos submitted to Ironshore as part of its request for the Policy.  To the extent that this argument advances an incorporation-by-reference theory, Ironshore has things backwards.  A party may be bound under an incorporation-by-reference theory only when it signs an agreement that incorporates an earlier agreement containing an arbitration provision—not when it signs an earlier agreement that does not contain arbitration provision, which is later incorporated into an agreement between other parties that does contain one. There is accordingly no triable issue as to whether McKenna is bound to arbitrate under an incorporation-by-reference theory.

2.    Agency.

a)    Legal standard.

"Under New York law, an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" Lerner v. Amalgamated Clothing & Textile Workers Union, 938 F. 2d 2, 5 (2d Cir. 1991) (quoting Mencher v. Weiss, 306 N.Y. 1, 4 (1953)).  This "well-established principle" that an agent is not bound by his principal's contracts in the absence of clear evidence to the contrary "has consistently been applied in the arbitration context." Arhontisa Maritime Ltd. v. Twinbrook Corp., No. 01-CV-5044, 2001 WL 1142136, at *4 (S.D.N.Y. Sept. 27, 2001); see also Domke on Commercial Arbitration § 13:3 (3d

14

ed. 2014) [hereinafter Domke] ("[I]f a corporate officer signs an arbitration agreement contained in a contract only on behalf of the corporation, that arbitration agreement cannot be applied to claims against the officer as an individual.").

In Veera v. Janssen, a corporation's managing directors were not bound by an arbitration clause they signed on the corporation's behalf where the agreements at issue did not state that the agents were parties or otherwise refer to them by name, and where the agreements' signature lines made clear that they were signing on the companies' behalves.  No. 05-CV-2145(SHS), 2005 WL 1606054, at *1, *4 (S.D.N.Y. July 5, 2005).  Similarly, in Zimring v. Coinmach Corp., the owner of a business that was party to a purchase agreement was not bound by the agreement's arbitration clause because he signed the agreement "on behalf of his company with full knowledge of the arbitration provision" and "he expressly limited his signature in such a way so that he did not agree to arbitrate."  No. 00 Civ. 8111 LMM, 2000 WL 1855115, at *4 (S.D.N.Y. Dec. 19, 2000).  In contrast, in In re HBLS, L.P., an individual who signed an agreement containing an arbitration clause both on behalf of certain companies and as a shareholder with an interest in those companies was bound by the arbitration clause, as he had signed the agreement "as a private person."  No. 01 Civ. 2025 (JGK), 2001 U.S. Dist. LEXIS 19112, at *26 (S.D.N.Y. Nov. 21, 2001).  There, the court also noted that the terms of the arbitration clause at issue was "very broad and [we]re not limited to disputes between the signatories."  Id.

Although corporate agents are generally not bound by an arbitration provision contained in an agreement they signed only on behalf of the corporation, they are "protected" by that agreement "to the extent they are charged with misconduct within the scope of the agreement[]." Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360 (2d Cir. 1993); see also Domke § 13:3 ("To the extent that a suit alleges misconduct that relates to behavior as officers or directors or in their capacities as agents of the corporation, the courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals."). That is, the corporate agent may use the arbitration provision as a sword to compel arbitration, which is to say, a shield against litigation before a court.[8] See, e.g., Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 668-69 (2d Cir. 1997) (agent entitled to invoke his principal's arbitration agreement); Alghanim v. Alghanim, 828 F. Supp. 2d 636, 650 (S.D.N.Y. 2011) (non-signatory to arbitration agreement could compel arbitration under agency theory).

   b) Discussion.

  Although McKenna acted as Eidos' agent in applying for the Policy by serving as Eidos' counsel and authoring and signing several documents, McKenna did not sign the Policy itself on Eidos' behalf, and Ironshore is unable to point to any evidence that McKenna clearly and explicitly intended to be subject to the

---

[8] In several cases, courts in this district have cited Roby or cases that in turn cite Roby as support for the proposition that an arbitration agreement may be enforced by and against agents, employees, and/or officers of a corporate entity. See, e.g., Blyden v. Sydney Leasing Ltd P'ship, 2012 U.S. Dist. LEXIS 110319, at *3 n.1 (S.D.N.Y. 2012); CMT Fashions (H.K.) Ltd. v. CMT Fashions (USA) Inc., 1998 U.S. Dist. LEXIS 20403, at *6-7 (S.D.N.Y. 1998). The Second Circuit has never extended Roby beyond its specific factual context, namely, a situation in which a corporation's agent, employee, or officer is the party seeking the protection of the arbitration clause at issue.

arbitration clause.  McKenna therefore cannot be bound by the Policy's arbitration agreement under an agency theory.

Sedmak likewise cannot be bound by the Policy's arbitration agreement because it is undisputed that he did not sign the Policy itself, either on Eidos' behalf or individually.  Further, there is no triable issue as to whether Sedmak is subject to the arbitration agreement as a corporate agent because of his participation in applying for the Policy.  As in both <u>Veera</u> and <u>Zimring</u>, there is no evidence here that Sedmak signed any of the relevant documents in his individual capacity, as opposed to as an officer of Eidos, and in this sense, Sedmak's case is clearly distinguishable from <u>In re HBLS</u>, where the corporate officer had signed the agreement at issue as a private shareholder.  Further, unlike the broad arbitration clause at issue in <u>In re HBLS</u>, which was "not limited to disputes between the signatories," 2001 U.S. Dist. LEXIS 19112 at *26, here the Policy's arbitration clause only contemplates a two-party arbitration procedure between the "the Insurer," which is Ironshore, and the "Insured," which is Eidos.  (SOC ex. A § V.D.)

Sedmak's alleged misuse of funds from the Loan does not change this analysis.  Even accepting, <u>arguendo</u>, that Sedmak misappropriated such funds, <u>Roby</u> could only be invoked by Sedmak in seeking to compel Ironshore to arbitrate. In any event, any dispute over Sedmak's alleged misappropriation of funds would not be within the scope of the Policy's arbitration clause, as it does not concern Eidos' insurance coverage and thus would not be "in connection with" the Policy.

Thus, there is no triable issue as to whether Sedmak is bound by the Policy's arbitration clause under an agency theory.

        3.      <u>Veil-piercing/alter-ego.</u>

        a)      Legal standard.

A non-signatory "may be bound to arbitrate where it exercised complete control over a signatory and employed that domination to injure another signatory to the agreement." <u>Masefield AG v. Colonial Oil Indus.</u>, 2005 U.S. Dist. LEXIS 6737, at *17-18 (S.D.N.Y. 2005) (citing <u>Thomson-CSF</u>, 64 F.3d at 777-78).  In determining whether "complete control" exists, courts consider factors such as "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." <u>Freeman v. Complex Computing Co.</u>, 119 F.3d 1044, 1053 (2d Cir. 1997).

        b)      Discussion.

Ironshore argues that Sedmak is bound to arbitrate as Eidos' alter ego due to his alleged misuse of loan proceeds to pay himself a salary, which Sedmak decries as a "wild speculation."  (Sedmak Reply Br. at 5.)  However, aside from Sedmak's alleged misappropriation of loan proceeds, Ironshore points to no other evidence counseling toward piercing Eidos' corporate veil, and what little other evidence

18

there is argues against doing so—Eidos files its own tax returns, and the Policy application documents are signed "Eidos, LLC" and "Eidos Partners, LLC," "by" Sedmak and Staykov as those companies' officers.  (SOC ex. I.)  Given the parties' material factual dispute as to this issue, granting summary judgment for McKenna, Sedmak, or Ironshore on a veil-piercing or alter-ego theory would be inappropriate, and the Court declines to do so.

4.   Direct-benefit estoppel.

a)   Legal standard.

Under the doctrine of direct-benefit estoppel, "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."  Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (citing Thomson-CSF, 64 F.3d at 778-79).

A benefit is direct if it flows directly from the agreement, as opposed to merely being a consequence of the contractual relations of the parties to the agreement.  Republic of Ecuador v. Chevrontexaco Corp., 499 F. Supp. 2d 452, 457-58 (S.D.N.Y. 2007), aff'd, 296 Fed. App'x 124 (2d Cir. 2008).  Courts have found nonsignatories to have directly benefited from agreements under three circumstances.

First, a nonsignatory may be deemed to have directly benefited from an agreement containing an arbitration clause if the purported benefit was "specifically contemplated by the relevant parties."  Life Techs. Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011).

Second, a nonsignatory may admit to having directly benefited from an agreement containing an arbitration clause, for example by suing as a third-party beneficiary of that agreement.  See, e.g., World Omni Fin. Corp. v. Ace Capital Re Inc., 64 Fed. App'x 809, 812-13 (2d Cir. 2003) (summary order) (nonsignatory to reinsurance policy that apparently sued as a third-party beneficiary of that policy estopped from denying a duty to arbitrate based on arbitration clause in the policy agreement).

Third, a nonsignatory directly benefits from an agreement containing an arbitration clause if it enables that party to receive a tangible benefit, typically a financial benefit such as the receipt of legal fees, cheaper insurance rates, licensing fees, or the issuance of an insurance policy.  See, e.g., Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., L.L.P., 523 Fed. App'x 761, 762-63 (2d Cir. 2013) (summary order) (legal fees); Tencara, 170 F.3d at 351-53 (cheaper insurance rates and ability to fly under nation's flag in international yachting competition); Alfa Laval U.S. Treasury, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 857 F. Supp. 2d 404, 414 (S.D.N.Y. 2012) (issuance of insurance policies); Life Techs. Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270, 277-79 (S.D.N.Y. 2011) (use of trademarks); Wu v. Pearson Educ., Inc., No. 09 Civ. 6557 (RJH), 2010 U.S. Dist. LEXIS 103488, at *1-4, *8-9 (S.D.N.Y. Sept. 30 2010) (licensing fees).

For example, in Robinson Brog, a plaintiff law firm sued another law firm for a share of the contingency fee from their joint representation of a group of investors,

and the defendant law firm argued that the case was subject to arbitration.  523 Fed. App'x at 762-63.  Three documents governed the joint representation; one of the agreements contained an arbitration clause, but it was not signed by the plaintiff law firm.  Id.  The plaintiff law firm argued that direct-benefit estoppel did not apply because it sought to enforce its claims solely under the provisions of one of the other two agreements, which did not contain arbitration clauses.  Id. at 762. The Second Circuit disagreed, holding that direct-benefit estoppel applied because "only by virtue of the [three agreements] functioning together is there a basis for generating a potential recovery," as "[w]ithout a client to represent, there could be no net settlement or recovery and thus no basis for distributing attorneys' fees."  Id. at 763.

In a similar vein, in Tencara, yacht owners who were not signatories to an agreement containing an arbitration clause were found to have directly benefited from the agreement because it enabled their yacht to be insured at cheaper rates, and it also enabled the yacht to fly under the French flag in an international competition.  170 F.3d at 351-53.  And in Alfa Laval, a court found nonsignatories to indemnity agreements containing arbitration clauses to have directly benefited from them where those agreements were the source of an obligation to issue insurance policies from which the nonsignatories admitted they had benefited.  857 F. Supp. 2d at 414.

A benefit is indirect "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the

agreement itself." MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001) (citing Thomson-CSF, 64 F.3d at 778-79).  Put another way, a benefit is indirect "when the parties to the agreement with the arbitration clause would not have originally contemplated the non-signatory's eventual benefit." Life Techs. Corp., 803 F. Supp. 2d at 276.

For example, in Masefield AG v. Colonial Oil Industries, a court in this District held that a non-signatory to a fuel oil purchase contract did not directly benefit from receiving proceeds from that contract, because its entitlement to the proceeds flowed not from the contract itself but rather from a preexisting debt obligation.  No. 05 Civ. 2231(PKL), 2005 WL 2105542, at *1-4 (S.D.N.Y. Sept. 1, 2005).  The court also determined that "[p]articipating in the Contract negotiations and assisting in the satisfaction of some of its terms . . . d[id] not necessarily render plaintiffs direct beneficiaries."  Id. at *4.

Another case in which a court found a benefit to be indirect was Arhontisa Maritime Ltd. v. Twinbrook Corp., No. 01 CIV. 5044(GEL), 2001 WL 1142136, at *1-4 (S.D.N.Y. 2001).  There, the attorney-in-fact for a signatory to an agreement for the sale of a ship was found not to be bound to arbitrate under the agreement's arbitration provision due to direct-benefit estoppel because he was effectively just an escrow agent, and he therefore received no real tangible benefit from the purchase agreement.  Id.

Courts have also held that a nonsignatory cannot be bound to arbitrate under a direct-benefit estoppel theory solely due to their association with a signatory.

E.g., MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 62 (2d Cir. 2001) ("[A] signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." (citing Thomson-CSF, 64 F.3d at 779)); Alfa Laval, 857 F. Supp. 2d 414 (the mere fact of a party's affiliation with a signatory is insufficient to estop that party from avoiding arbitration, "no matter how close the affiliation is" (quoting Oppenheimer & Co. Inc. v. Deutsche Bank AG, No. 09 Civ. 8154(LAP), 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010))).

> b)      Discussion.

Ironshore argues that McKenna is bound to arbitrate because as legal counsel in the underlying patent litigation they are a direct beneficiary of the Policy.  Specifically, Ironshore argues that the Policy and the Loan were issued together for the express purpose of paying McKenna's legal fees.  The Court agrees; there is no triable issue as to whether McKenna received a direct benefit from the Policy, and McKenna is therefore estopped from denying a duty to arbitrate under it.

It is undisputed that McKenna received $11,084,893 in legal fees from the patent enforcement litigation program, which was financed by the Loan, for which the issuance of the Policy was a condition precedent.  In short, the Policy led directly to the Loan from Stairway to Eidos, which led directly to Eidos paying McKenna.  Just as the plaintiff in Robinson Brog directly benefited from three agreements "functioning together," 523 Fed. App'x at 763, here there is no triable issue as to whether McKenna earned legal fees by virtue of the Loan and the Policy

functioning together.  And just as the nonsignatories in <u>Alfa Laval</u> directly benefited from an agreement that was the source of an obligation to issue insurance policies from which they benefited, here there is no triable issue as to whether McKenna has directly benefited from an agreement that was the source of the fulfillment of a condition precedent to the Loan, from which McKenna has undisputedly benefited.

Further, there is no triable issue as to whether McKenna's benefit was specifically contemplated by the parties, as the documents submitted by McKenna to Ironshore during the process of applying for the Policy indicated that McKenna would serve as counsel in the patent enforcement litigation program.  McKenna's role under the set of agreements in this case went beyond merely participating in procuring them, or serving as a passive facilitator, making this case clearly distinguishable from <u>Masefield</u> and <u>Arhontisa</u>.  Because the Policy was essential to enabling McKenna to obtain a tangible financial benefit, there is no triable issue as to whether McKenna is estopped from denying its duty to arbitrate pursuant to the Policy.

With regard to Sedmak, Ironshore argues that he is estopped from denying the obligation to arbitrate because he received a direct benefit from the Policy in the form of several million dollars, as well as other benefits as Eidos' principal.  (14-cv-6675 ECF No. 11 ¶ 60.)  In response, Sedmak argues that any benefits he has received from the Policy are "at least two steps removed from the Policy." (14-cv-6675 ECF No. 26 at 5.)

It is, of course, true that Sedmak's mere association with Eidos or Warren &
Lewis Investment Corporation would be insufficient on its own to estop him from
denying his duty to arbitrate under the Policy.  See MAG Portfolio, 268 F.3d at 62.
Yet Sedmak does not deny that Eidos used proceeds from the Loan to pay himself a
salary in the millions of dollars, or that $2 million in proceeds from the Loan was
transferred to Warren & Lewis Investment Corporation, a corporation in which
Sedmak is the owner and general partner.  In this sense, the Policy enabled him to
obtain a tangible financial benefit, and in no more roundabout a way than McKenna
did.  There is therefore no triable issue as to whether Sedmak is estopped from
denying his duty to arbitrate pursuant to the Policy.

> 5. Third-party beneficiary.

> a) Legal standard.

A third party beneficiary of an agreement may be bound by an arbitration
clause if they were an intended beneficiary of the agreement and knowingly
accepted the benefits of the agreement.  See In re HBLS, L.P., 2001 U.S. Dist.
LEXIS 19112, at *28 ("Third party beneficiaries of a contract will also be bound by
an arbitration clause under ordinary principles of contract."); H.D. Brous & Co., Inc.
v. Mrzyglocki, 2004 U.S. Dist. LEXIS 3095, at *20 (S.D.N.Y. 2004) ("If a contract
containing an arbitration clause is entered into between parties with at least the
partial purpose of benefitting a third party and that party accepts those benefits,
the third party may not disclaim its duty to arbitrate under the agreement.").

b)      Discussion.

It is undisputed that Eidos obtained the Policy because it was required to do so as a condition for the Loan, and the purpose of the Loan was to fund patent litigation in which McKenna served as lead counsel.  In other words, it is undisputed that Eidos obtained the Policy in order to obtain funds to pay McKenna's legal fees.  Further, it is undisputed that McKenna was paid millions of dollars in legal fees in connection with the patent enforcement litigation program. McKenna was therefore an intended beneficiary of the Policy, and it knowingly accepted the benefits of the agreement, and it is thus bound by the arbitration provision in the Policy as an intended third party beneficiary.

With regard to Sedmak, however, there is no evidence that Ironshore intended for Sedmak to personally receive the benefits of either the Policy or the Loan at the time the Policy was negotiated and issued—whether Sedmak did so later on by paying himself a salary with proceeds from the Loan is a different question, and in any event Ironshore's contentions that Sedmak did so belies any argument that Sedmak was an intended beneficiary of the Policy.

IV.    CONCLUSION

For the above reasons, there is no triable issue as to whether plaintiffs have directly benefited from the Policy, or as to whether McKenna was an intended third-party beneficiary of the Policy and knowingly accepted benefits stemming from the Policy.  Although Ironshore has not cross-moved for summary judgment, the Court has previously given notice and a reasonable time to respond to its intention to grant summary judgment in nonmovant Ironshore's favor.  Accordingly, the Court

has now appropriately GRANTED summary judgment for Ironshore as to Count I and Count II of McKenna's causes of action and as to Count I and Count II of Sedmak's causes of action.[9]

The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated:      New York, New York
            January 12, 2015

_____
            KATHERINE B. FORREST
            United States District Judge

---

[9] Ironshore argues that if this Court determines that it has jurisdiction over this action, this Court should give Ironshore the opportunity to obtain discovery from plaintiffs regarding the benefits they received under the insured program.  (Opp. Br. at 34.)  Because the Court has granted summary judgment for Ironshore, the Court need not entertain this request, and it is accordingly denied.